## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JANE DOE, | : | |
| Plaintiff, | : | Civil Action No.: |
| v. | : | |
| WILLIAM J. BURNS, DOUG VAN ZANDT, JOHN DOE, RICHARD ROE and the CENTRAL INTELLIGENCE AGENCY, | : | **JURY TRIAL DEMANDED** |
| Defendants. | : | |

### PLAINTIFF JANE DOE'S COMPLAINT AGAINST DEFENDANTS WILLIAM J. BURNS, DOUG VAN ZANDT, JOHN DOE, RICHARD ROE AND THE CENTRAL INTELLIGENCE AGENCY

### NATURE OF THE CASE

1.      The Roman poet Juvenal wisely asked, "*Quis custodiet ipsos custodes*?"—who will watch the watchmen themselves?[1]

2.      Plaintiff is a married Central Intelligence Agency ("CIA" or "the Agency") trainee. On July 13, 2022, a fellow CIA trainee sexually assaulted Plaintiff in a stairwell at CIA headquarters in Langley, Virginia.   After Plaintiff reported that attack to the Agency, CIA repeatedly and improperly sought to dissuade her from lodging a criminal complaint—to the point of criminal witness tampering—and also ordered her to make false statements to law enforcement.

3.      Notwithstanding the Agency's concerted efforts to dissuade her, after Plaintiff displayed the courage to make truthful reports to federal and local law enforcement, she then

---

1.      JUVENAL, SATIRE VI, 347–48.

obtained a protective order against her assailant from the Fairfax County, Virginia General District Court.  CIA refused to allow local law enforcement to serve the protective order at its headquarters.

4.       On or about January 8, 2023, Plaintiff received protected whistleblower status in order to speak with the United States Congressional oversight committees with jurisdiction over CIA.  In response, the Agency warned Plaintiff that she faced unspecified "consequences" if she spoke with CIA's oversight committees.

5.       As Plaintiff's assailant awaited his August 2023 criminal trial in Fairfax County, Virginia, Agency officials retaliated against Plaintiff for her legally protected statements to law enforcement, Congress, and subsequently inspectors general, in which she described being victimized by a federal officer on federal property.  Among other things, CIA did so by divulging Plaintiff's personal information held in Agency records and spreading false allegations of an extramarital affair by Plaintiff.

6.       CIA furthered its sordid campaign against Plaintiff in connection with her assailant's criminal proceedings by violating the Privacy Act, 5 U.S.C. § 552a, by sharing her personal Agency records with her assailant's defense team in an attempt to intimidate her from testifying at the criminal trial.  Plaintiff once again acted courageously and testified at the trial.

7.       On August 23, 2023, the Fairfax County General District Court found Plaintiff's assailant guilty of assault and battery, despite the Agency's improper and illegal efforts on her assailant's behalf.  Defendants violated Plaintiff's privacy rights and civil rights, and interfered with law enforcement in ways forbidden by federal statute.

## JURISDICTION

8.       The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this matter arises under the Privacy Act, 5 U.S.C. § 552a, and provisions of the Civil Rights Act of 1871, also known as the Ku Klux Klan Act, including 42 U.S.C. §§ 1985, 1986 and

1988.  Pursuant to Section 552a(g)(5) of the Privacy Act, the Court has personal jurisdiction over

Defendants CIA, its director William J. Burns ("Burns"), and its officers Doug Van Zandt ("Van

Zandt"), John Doe and Richard Roe, as they are a federal agency and federal officers, respectively.

## VENUE

9.     Venue in this District is proper because Privacy Act suits may, by the terms of

that statute, be brought in this Court pursuant to Section 552a(g)(5).

## THE PARTIES

10.     Plaintiff is a married, thirty-five-year-old CIA Clandestine Service Trainee.  In

2022, CIA recruited Plaintiff and began to train her to "clandestinely spot, assess, develop, recruit,

and handle non-U.S. citizens with access to foreign intelligence . . . ."[2]  As a U.S. citizen, Plaintiff

enjoys rights of free speech and to petition the government for redress of her grievances.  As a

public servant, she holds a responsibility to speak to Congressional oversight committees of

jurisdiction, inspectors general, and law enforcement concerning violations of the law.

11.     Defendant CIA is a U.S. government agency entrusted to provide intelligence on

foreign countries and global issues to the President and other policymakers.  CIA is obligated to

"protect fully the legal rights of all United States persons, including freedoms, civil liberties, and

privacy rights guaranteed by Federal Law."[3]  CIA is subject to Congressional oversight and may

not interfere with any organization's law enforcement responsibilities.[4]   CIA is statutorily

---

2.     CENT. INTEL. AGENCY, *Browse CIA Jobs—Case Officer*,
https://www.cia.gov/careers/jobs/case-officer/ (last visited Sept. 20, 2023).

3.     United States Intelligence Activities, 46 Fed. Reg. 59941, 59942 (Dec. 8, 1981);
*reprinted as amended in* 73 Fed. Reg. 45325, 45325 (Aug. 4, 2008).

4.     *Id.* at 45329.

forbidden from exercising domestic law enforcement powers or internal security functions.[5]

12.     Defendant Burns became director of CIA on March 19, 2021 and remains in that post today.  Regarding the sexual assault and harassment of CIA officers, Burns has stated that, under his leadership, CIA holds "no higher priority than taking care of our people."[6]

13.     Defendant Van Zandt was at the time of the acts in question the director of CIA's Office of Security.

14.     Defendants John Doe and Richard Roe are as-yet unidentified CIA officers who, without authorization, provided Plaintiff's workplace instant messages ("IMs") and videotapes of Plaintiff's statements to the Agency about her assault, to Plaintiff's assailant and/or his defense counsel.  Despite these unlawful disclosures, the Fairfax County General District Court convicted Plaintiff's assailant of assaulting and battering Plaintiff—the first-ever conviction for workplace sexual violence at the Agency.

## FACTUAL ALLEGATIONS

A.     The Assault on Plaintiff

15.     On July 13, 2022, Plaintiff's assailant, a male CIA trainee, snuck up behind Plaintiff (who is hearing-impaired) in a stairwell at CIA headquarters in Langley, Virginia, wrapped a scarf tightly around her neck, began strangling her with it, made lewd remarks, and tried to kiss her forcibly on her mouth.  Plaintiff struggled, told her assailant to "stop," fought him off, and ran.  He immediately tried unsuccessfully to wrap the scarf around Plaintiff's neck again, followed Plaintiff

---

5.     50 U.S.C. § 3036(d)(1).

6.     CENT. INTEL. AGENCY OFF. OF PUB. AFFS., *CIA Taking Steps to Address Handling of Allegations of Sexual Assault and Harassment*, CENT. INTEL. AGENCY (May 11, 2023), https://www.cia.gov/stories/story/cia-taking-steps-to-address-handling-of-allegations-of-sexual-assault-and-harassment/.

to her office, and grabbed and forcibly kissed her.  Hours after the attack, her assailant twice texted Plaintiff to ask, "You good?"

16.     Plaintiff's assailant had earlier sent Plaintiff a series of obscene workplace IMs. Plaintiff's assailant's bizarre written remarks to her before the assault included a reference to "why to bleach the anus," a discussion of ejaculate, and a remark that a physical fitness trainer at CIA was "hot af," meaning hot as f***, and that therefore, "I'll get her ready to have Persian babies." (Plaintiff's assailant is Iranian-American.)

17.     On information and belief, Plaintiff's assailant earlier assaulted a subordinate at a social function while serving as a U.S. naval officer in Bahrain in November 2019.  The Navy reportedly investigated and handled the assault administratively, and sent Plaintiff's future assailant back to the U.S. without completing his deployment; this resolution would be reflected in his U.S. Government personnel record.  CIA's Office of Security either ignored or missed this clear red flag in its vetting of Plaintiff's assailant's suitability for Agency employment.  If Plaintiff's assailant omitted this assault from his application to the Agency, that is itself evidence of his unsuitability for a CIA security clearance, and its omission would constitute malfeasance on his part.[7]

B.     CIA's Response

18.     Within forty-eight hours of her stairwell assault, Plaintiff reported that attack to several offices within the Agency.  CIA's responses to Plaintiff repeatedly violated the law, professional ethics, and basic human decency.

---

7.     OFF. OF DIR. OF NAT'L INTEL, Security Executive Agent Directive 4, 1, 12 (Jun. 8, 2017), https://www.dni.gov/files/NCSC/documents/Regulations/SEAD-4-Adjudicative-Guidelines-U.pdf; *Id.* at 13 (stating that omitting information relevant to an investigator in making a recommendation regarding a national security eligibility determination may be disqualifying).

19.     Among other things, CIA warned Plaintiff that reporting the attack to any law enforcement organization, or receiving necessary mental health care, would cause her to suffer negative career impacts at CIA, force her to consider a different career, and even make her a counterintelligence threat.  The Agency did not urge Plaintiff to undergo a sexual assault medical forensic examination, as would any disinterested, ethical and minimally competent health care or law enforcement professional.  Instead, CIA ordered Plaintiff that, if she did speak to law enforcement, she must protect her and her assailant's CIA affiliation or else commit a potentially career-ending security violation.

20.     CIA's attempts to deter Plaintiff from reporting a crime to law enforcement, and the Agency's order for her to knowingly conceal material facts such as her and her assailant's employer when reporting that crime, constitute illegal witness tampering and suborning false statements.  Information may never be classified to conceal crimes or to prevent embarrassment to a federal government agency.[8]  No exceptions to these laws exist that exempt CIA.

21.     On August 9, 2023 at her assailant's criminal trial, Plaintiff explained how CIA sought to dissuade her from making a full and truthful statement to law enforcement.

> Q: Okay. Do you -- do you recall that the people who were interviewing you from your employer told you that you should report this to law enforcement if that's what you wanted to do, right?
>
> A: They love to say that. They -- because of the nature of my work, this has been a repeated line from my work in saying, "Well, you should go and report it to law enforcement, but we won't support you. You may" – "you may divulge classified information.  Then we can fire you."
>
> So they will 100 percent tell you to go tell law enforcement, but they won't give you who to go tell.  They won't give you contact information.  They won't provide any sort of security, details that are meaningful and substantial and are helpful.

---

8.     Classified National Security Information, 75 Fed. Reg. 707, 710 (Jan. 5, 2010).

So in all essence, sure, they can tell me, "Yeah, you" – "if you feel comfortable," or, "If you want to go tell law enforcement, go do it."  But there are going to be consequences for that.

That is 100 percent a line that they give, and it is a line that has proven to be false over and over and over again with other victims of sexual assault in that federal workplace.

22.      Plaintiff's trial testimony regarding her experience is supported by her correspondence within CIA between the time of her assault and her subsequent complaints to law enforcement.

(i)      *CIA's Policy on Sexual Assault*

23.      CIA regulations provide that, "[i]n cases where sexual assault is alleged, [CIA's Office of Security] will conduct an administrative investigation, and can refer the case to local law enforcement in the jurisdiction where the incident occurred.  [The Office of Security] has persistent working relationship [*sic*] with several local law enforcement agencies" in the Washington, DC metropolitan area.  CIA boasts that its Office of Security's opinion offers "an ideal litmus test to gauge the criminal aspect of" an alleged sexual assault offense.

24.      CIA claims that its definition of sexual assault, which differs from federal criminal statutes, constitutes classified information.

(ii)     *CIA's Unlawful Advice to Plaintiff About Reporting Her Assault to Law Enforcement*

25.      On July 21, 2022, in purportedly conducting its  internal investigation, CIA advised Plaintiff not to contact law enforcement.  A CIA representative wrote,

[I]f you choose to proceed [engaging with law enforcement] then any investigation [CIA is] conducting will come to a complete stop.  They do not do concurrent investigations, and will have to wait to take any administrative actions, including disciplinary measures, until the police conclude theirs.  It is a difficult choice I am sure.  *Perhaps wait out the findings of the [Security] portion, and then determine how you wish to proceed.*

7

(Emphasis added.)

26.     Nearly three weeks after being sexually assaulted, Plaintiff had heard nothing from CIA concerning the result of its supposed investigation.  On August 2, 2022, Plaintiff complained to CIA that

> If I were in a normal workplace, at this point I would have gone to local law enforcement and to the military (he is a Navy Reservist) to report it—I feel it is important to put something on file before something additional happens … I am fairly certain he owns a gun … as I understand it, if I go to law enforcement or to the military to report it, the current [Security] process would stop.  I don't feel like I should feel unsafe at work ….

27.     During the week of August 8, 2022, on information and belief, Defendants Burns and Van Zandt received a briefing about the stairwell assault on Plaintiff.

28.     Through August 18, 2022, Plaintiff engaged in a written exchange with CIA's Office of Security, the Agency's Office of General Counsel, and others regarding her wish to report her assault to law enforcement.  CIA now claims that the bulk of this internal correspondence is classified.

29.     The Agency's assertion of classification is unlawful, because among other reasons, the Agency's advice to Plaintiff is both incorrect and unlawful.

30.     CIA's counsel unlawfully advised Plaintiff that she must not truthfully answer any of law enforcement's questions about purportedly classified matters without advance permission from the Agency.  CIA specifically ordered Plaintiff to protect the secret of her and her assailant's affiliation with the Agency.  CIA also ordered Plaintiff not to provide law enforcement with the names of any witnesses to her assault without the Agency's express permission.

31.     In advising Plaintiff, CIA explicitly referenced her obligations under the nondisclosure agreements she executed on her entry on duty with the Agency.  These agreements

specifically reference provisions of the Espionage Act, Chapter 37 of Title 18 of the United States Code, including the death penalty for certain violations of that statute.

32.    Plaintiff repeatedly sought clarification from CIA concerning to whom at which law enforcement organization she could complain, with what information about her assault, without violating her security agreements.  Plaintiff received no answer.

33.    By August 19, 2022, CIA's Office of Security determined inaccurately that Plaintiff's assailant had committed no crime, and that he purportedly posed no threat of further physical harm to Plaintiff.

34.    Also on August 19, 2022, Plaintiff wrote CIA that, "I still do not feel safe in the building.  I have had to devise my own safety plan.  This was done informally.  As such, I do not want to wear out the kindness of others who have ensured my safety up to this point."  Plaintiff also expressed concerns for the safety of other women employed at CIA.

35.    On or about August 29, 2022, CIA's Office of Equal Employment Opportunity asked Plaintiff why she believed that Plaintiff's assailant's attack on her constituted sexual assault.

36.    On or about September 1, 2022, CIA's Office of Security closed its investigation of Plaintiff's assailant.

37.    On or about September 26, 2022, CIA ordered Plaintiff not to discuss her assault with anyone and threatened her that doing so "may violate federal law."  Plaintiff replied to CIA that "reporting the sexual assault has given my attacker more rights than me and put him in a position of strength compared to me."

38.    On September 29, 2022, Plaintiff informed CIA that "i just feel that i could keep getting attacked here nothing would ever happen to the attacker like this place does not care" (punctuation as in original).

39.     On October 20 and 24, 2022, CIA informed Plaintiff—again, inaccurately under Virginia state law—that her assailant's conduct did not amount to assault.

40.     On November 11, 2022, CIA informed Plaintiff that, although her complaints of her assailant's physical misconduct in the CIA stairwell, and his earlier unsolicited and extremely vulgar remarks he sent her via workplace IMs, had all been substantiated, her assailant would not likely face any discipline.  CIA concluded that these grossly inappropriate remarks on a workplace instant message system "occurred as alleged but did not violate [CIA's] Zero Tolerance Policy" for sexual harassment.

C.      Plaintiff's Report to Federal Law Enforcement

41.     Plaintiff was understandably frustrated with CIA's dismissive responses to her assault, and decided to seek justice herself.  After learning that Plaintiff insisted on lodging a criminal complaint, CIA asked to facilitate the logistics of any interview of Plaintiff by the Federal Bureau of Investigation ("FBI").  Despite repeated assurances by the Agency to Plaintiff that it would arrange her interview, CIA claimed that FBI would not respond to CIA's repeated  requests to report a crime.

42.     At her own initiative (and over the Thanksgiving holiday), Plaintiff quickly made such arrangements, and complained to FBI on December 2, 2022.

43.     Over the next two and a half weeks, CIA informed Plaintiff that the U.S. Attorney's Office for the Eastern District of Virginia had appointed a prosecutor to investigate her complaint with the assistance of a Fairfax County police detective.  That was untrue.

D.      Local Law Enforcement Investigation

44.     On December 19, 2022, at her own initiative, Plaintiff went to Fairfax County, Virginia police to swear out a criminal complaint against her assailant.  After experienced police officers interviewed Plaintiff at length, they informed her that she had suffered a felony assault

10

involving strangulation.[9]  Ultimately, the lack of physical evidence in December 2022 of Plaintiff's strangulation in July 2022 led to Plaintiff's assailant being charged only with misdemeanor assault and battery.  But for CIA's misconduct in not advising Plaintiff to immediately obtain a sexual assault medical forensic exam, as would any health care or law enforcement professional in response to an alleged sexual assault, and but for the Agency repeatedly dissuading her from speaking with law enforcement in July 2022, Plaintiff's assailant would likely have been charged with a felony.

45.    On the advice of Fairfax County police, Plaintiff sought a protective order, as she twice encountered her assailant at work following his attack.  On December 30, 2022, Plaintiff received an order from the Fairfax County General District Court directing her assailant to have "no contact of any kind" with Plaintiff.

46.    A protective order in Virginia is not legally operative until it is personally served on the respondent by law enforcement.[10]  However, CIA and Plaintiff's assailant made service of the protective order as difficult as possible.

47.    Plaintiff's "no contact" order got served, with great difficulty, on or about January 11, 2023 and ultimately required the assistance of four local law enforcement agencies for two reasons.  First, Plaintiff's assailant falsely claimed to local law enforcement that he was not "in town" during their attempts to serve him, despite being indicated to others at the Agency as active on CIA headquarters computer systems during that time.  Second, CIA initially refused to accept service of the order on behalf of Plaintiff's assailant, to confirm to local police his CIA affiliation, and to allow representatives of the Fairfax County sheriff access to CIA headquarters to effectuate

9.    VA. CODE ANN. § 18.2-51.6.

10.    VA. CODE ANN. § 19.2-152.9(c).

service.  There was no legitimate reason for CIA to refuse to assist local law enforcement.

48.     On or about January 9, 2023, before service of the "no contact" order on Plaintiff's assailant, Plaintiff suffered the trauma of further contact with him inside CIA headquarters.  At this time, Plaintiff's assailant knew from law enforcement of the yet-unserved "no contact" order.  But for CIA's intransigence in refusing law enforcement access to its headquarters to serve that order, Plaintiff's assailant would also be guilty of criminal violation of the "no contact" order.[11]

E.     Congressional and Inspector General Investigations

49.     The United States House Permanent Select Committee on Intelligence ("HPSCI") and United States Senate Select Committee on Intelligence ("SSCI") are CIA's Congressional oversight committees of jurisdiction.[12]  Members of Congressional committees are security-cleared by operation of their election to Congress, and selected to those committees by Congressional leadership; their staffs are security-cleared by the U.S. intelligence community; and their offices are located in secure, special compartmented information facilities.

50.     On January 9, 2023, Plaintiff became the first of dozens of women to inform Congress of abusive treatment within CIA, "telling authorities and Congress not only about sexual assaults, unwanted touching and coercion but of what they contend is a campaign by the spy agency to keep them from speaking out, with dire warnings it could wreck their careers and even endanger national security."[13]  Plaintiff formally received whistleblower status from the

---

11.     VA. CODE ANN. § 18.2-60.4.

12.     U.S. HOUSE PERMANENT SELECT COMM. ON INTEL., *History and Jurisdiction*, https://intelligence.house.gov/about/history-and-jurisdiction.htm (last visited Sept. 20, 2023); U.S. SENATE SELECT COMM. ON INTELL., *About the Committee*, https://www.intelligence.senate.gov/ (last visited Sept. 20, 2023).

13.     Jim Mustian & Joshua Goodman, CIA stairwell attack among flood of sexual misconduct complaints at spy agency, ASSOCIATED PRESS (Aug. 24, 2023, 3:56 PM),

Intelligence Community Inspector General before speaking to HPSCI and SSCI.  However, CIA's Office of Congressional Affairs refused to speak with Plaintiff's attorney, and despite knowing that she was a represented party, instead improperly reached out to Plaintiff directly and warned her that "there would be consequences" for her statement to HPSCI.

51.     On April 4, 2023, CIA renewed its threat to Plaintiff about discussing her assault, and ordered her to refrain from discussing the Agency's inquiry into the assault.

52.     On April 27, 2023, Plaintiff gave her statement to SSCI about the adverse treatment she experienced.   On the basis of Plaintiff's statement, SSCI demanded that CIA's Inspector General ("IG") immediately investigate several allegations of sexual assault and sexual harassment committed against CIA officers by CIA officers, "that are alleged to have been grossly mishandled by the CIA."  Plaintiff then also spoke with CIA's IG office.

53.     On September 19, 2023, at the request of Congress, Plaintiff testified to members of HPSCI at a closed hearing about her experience as a victim of sexual assault at CIA.

F.     CIA's Retaliation

54.     In retaliation for Plaintiff's actions in lawfully speaking to federal and local law enforcement, Congress and inspectors general, Plaintiff suffered from CIA (i) a pretextual search of her records for time-and-attendance fraud, (ii) Privacy Act and Civil Rights Act violations, (iii) a false statement designed to knock her off-balance while she attended a challenging CIA training program, and (iv) the downgrading of her performance evaluation.

(i)     *Pretextual Search for Time-and-Attendance Fraud*

55.     After speaking to Congress, on or about May 3, 2023, Plaintiff learned that CIA's Human Resource Services had undertaken a review of her time-and-attendance records ("T&A").

---

https://apnews.com/article/cia-sexual-harassment-discrimination-abuse-spying-8ca2f3a4b41c9d6f3da34364aea42dad.

There was no legitimate basis for CIA to undertake that review, as Plaintiff's T&As displayed no anomalies which might in the ordinary course draw legitimate attention, such as unusual work hours, excessive absences or an extraordinary amount of claimed overtime.  Neither did this scrutiny stem from Plaintiff's T&As being randomly selected for quality control review.

56.     Rather, CIA often investigates disfavored officers' records in search of time-and-attendance violations, such as clocking in slightly too late or clocking out slightly too early while claiming to have worked a full day.  If they exist, such misstatements may then be used to discipline, dismiss, or even prosecute an officer.  This is a well-known retaliation tactic within CIA.

57.     To their credit, Plaintiff's immediate supervisors pushed back on her behalf, and demanded to know why CIA sought Plaintiff's T&A records—further evidencing that those inquiries were unfounded and unnecessary.  CIA responded, unconvincingly, that Plaintiff's excused and documented absences for mental health appointments raised suspicions.

(ii)     *Privacy Act and Civil Rights Act Violations*

58.     CIA officers engage in communications with one another in several ways, including through "cables" for formal correspondence among CIA headquarters, stations and bases; less-formal emails; and IMs for informal chats.  There is also an officer's "hall file":  the internal CIA grapevine about whether an individual is a good officer.

59.     On or about August 3, 2023, during the pendency of Plaintiff's assailant's criminal trial, Plaintiff's counsel learned from her assailant's counsel that classified IMs received from CIA suggested that Plaintiff sought by her complaint to cover up an extramarital affair.  (Plaintiff's assailant's counsel properly alerted the prosecutor and Plaintiff's counsel of his receipt of these IMs.)  On the basis of these classified IMs, defense counsel suggested that Plaintiff consider

14

withdrawing her complaint against his client or accept a resolution involving no criminal liability on the part of her assailant.

60.     Only CIA would have access to these classified IMs because they took place between Agency officers corresponding, in the ordinary course, under their internal Agency pseudonyms; yet these messages were now connected to the "true names" of a complainant (Plaintiff) and defendant (her assailant) in a criminal case that was a matter of public record.[14] Only the Agency's Office of Security is authorized to produce these classified IMs to anyone, and then only with the prior permission of CIA's General Counsel.  CIA did not initially provide these IMs to the Fairfax County court or the county prosecutor.  Nor did their production by CIA come as a result of a court-ordered subpoena or a request from law enforcement.

61.     The Fairfax County prosecutor assured Plaintiff that her objections to any attempt by her assailant's counsel to introduce these classified IMs into evidence would be sustained, on grounds of irrelevance and lack of foundation.  Plaintiff elected to proceed in the face of the threatened disclosures.

62.     While irrelevant to Plaintiff's complaint of a workplace assault and battery by her assailant, Plaintiff did not conduct an extramarital affair.  John Doe or a colleague, Richard Roe, accessed Plaintiff's IMs, printed her records from a top-secret computer system, and provided copies of these IMs to Plaintiff's assailant's defense team only after selectively editing Plaintiff's IMs to make them appear salacious:  they are neither a complete record of the individuals' workplace correspondence, nor in any way relevant to Plaintiff's complaint.  Rather, the threat to introduce IMs embarrassing to Plaintiff is what is known colloquially as "slut shaming"—an effort

---

14.     In addition to their true names, and any operational or training alias names, CIA officers within the Directorate of Operations are known internally by pseudonyms, the interrelationship of which is classified.

to undermine a valid claim of sexual assault by alleging that the complainant's purported consensual sex with others mitigates her assailant's nonconsensual acts.

63.     On reviewing the classified IMs on the day of the trial, Plaintiff stated that she never informed her assailant of the name of the person with whom Plaintiff was corresponding via those IMs.  Instead, CIA must have reviewed Plaintiff's workplace messages in search of evidence to exculpate Plaintiff's assailant, and then selectively edited and produced her workplace IMs to assailant's defense counsel.  (For example, Plaintiff's remarks about feeling sore after a physical fitness workout performed with a colleague were presented out of context, as if her remarks referred instead to feeling sore after sex with that colleague.)

64.     Only someone at CIA could have culled these messages from Plaintiff's workplace IMs and presented them as correspondence with an individual with whom she purportedly had an affair.  Even assuming *arguendo* that her assailant somehow guessed the name of Plaintiff's supposed lover and asked his defense counsel to request that individual's IMs from CIA, the Agency at first only provided these messages to her assailant's defense counsel, and did so absent Plaintiff's permission, a court order, or any law enforcement request.

65.     CIA also produced—again absent Plaintiff's permission, a court order, or law enforcement request—tapes of Plaintiff's recorded statements to Agency officials about her assault.  Defense counsel used Plaintiff's statements to cross-examine her at trial.

66.     CIA—acting through John Doe and Richard Roe, whose identities can be ascertained through discovery in this action, and whom by Agency regulation could only have acted with the permission of CIA's Offices of Security and General Counsel—attempted to prevent the conviction of Plaintiff's assailant for a violent crime, by trying to intimidate Plaintiff from testifying.

67. CIA officials engaged in this misconduct for several reasons, including to stigmatize Plaintiff, minimize her testimony, and blacken her informal but essential "hall file" inside of its Directorate of Operations.

68. Defendants' conduct regarding Plaintiff was patently egregious, as they acted in unlawful retaliation against Plaintiff for her protected speech as a whistleblower. Lacking Plaintiff's permission to share her Agency records with her assailant's defense team, or any request from law enforcement or court order for those CIA records, the Agency and its officers could have no grounds to believe that their unauthorized disclosure was lawful. Defendants thereby flagrantly disregarded Plaintiff's rights as part of an illegal campaign of retaliation.

69. John Doe's and Richard Roe's actions further specifically constitute a misdemeanor violation of the Privacy Act[15] and felony witness tampering.[16] These acts may also represent a felony act of computer fraud.[17]

70. Defendants Burns, Van Zandt, John Doe, Richard Roe and CIA violated Plaintiff's statutory privacy rights.[18] In addition, Defendants interfered with law enforcement's responsibilities to investigate and prosecute the assault and battery of Plaintiff.[19] Defendants did

---

15. 5 U.S.C. § 552a(a)(i)(1) (stating that "an agency officer, who by virtue of his position, has access to agency records containing individually identifiable information the disclosure of which is prohibited, knowing its disclosure is prohibited, willfully discloses it to anyone not entitled to receive it, is guilty of a misdemeanor").

16. 18 U.S.C. § 1512(b)(2-3) (stating that whoever knowingly attempts to use intimidation intended to cause any person to withhold testimony from an official proceeding commits a felony).

17. 18 U.S.C. § 1030(a)(3) – (c) (stating that whoever intentionally and without authorization accesses a federal agency's nonpublic computer commits a felony).

18. *See generally* 5 U.S.C. § 552a.

19. United States Intelligence Activities, supra note 3 at 59949-50.

so in further violation of Plaintiff's right to equal protection of the laws, as a woman, under the Civil Rights Act of 1871.[20]

71.    No federal agency may disclose a record about a U.S. citizen, held within a system of records, to another agency "except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains."[21]  Only limited exceptions apply, such as in response to a formal written request from the head of a law enforcement agency "specifying the particular portion desired and the law enforcement activity for which the record is sought," or pursuant to a lawful court order.[22]

72.    Federal agencies are statutorily required to establish safeguards to ensure their records' confidentiality, to protect against threats to their integrity "which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained."[23]

73.    Whenever a federal agency fails to comply with the Privacy Act in such a way as to cause an adverse effect on an individual, that individual may bring a civil action against that agency in a U.S. District Court.  If the Court determines that the agency acted intentionally or willfully, the United States is liable to the individual in an amount equal to the sum of actual damages from that misconduct, the costs of the action, and reasonable attorneys' fees.[24]

---

20.    42 U.S.C. § 1985; *see also id.* § 1986.

21.    5 U.S.C. § 552a(b).

22*.    Id.* § 552a(b)(7); *see also id.* § 552a(b)(11).

23.    *Id.* § 552a(e)(10).

24.    *Id.* § 552a(g)(1)(D); *see also id.* § and 552a(g)(4).

74.     Unlike the federal criminal code, from which CIA is not exempt, the Privacy Act exempts the Agency from certain parts of that statute.  However, CIA is specifically **not** exempt from the portion of the Privacy Act that forbids unauthorized disclosure of records without the consent of the individual to whom those records pertain.

(iii)    *False Statement by CIA's Office of Public Affairs to Plaintiff*

75.     On August 16, 2023, during a recess in Plaintiff's assailant's trial, CIA's Office of Public Affairs ("OPA") pulled Plaintiff out of an ongoing training session, part of her regular employment duties at that time, to tell her that the Associated Press ("AP") was in the process of deciding "at the highest levels" whether to publish her name in relation to the criminal case against her assailant, an event that would effectively end her Agency career.

76.     That statement was untrue.  Rather, the AP repeatedly reassured CIA's OPA that, in accordance with its publicly available policies, the AP would **not** publish Plaintiff's name as a sexual assault victim.  OPA could not have been confused on this basic point.  The unnecessary interruption of Plaintiff's intensive training with OPA's false statement caused her considerable distress before the AP confirmed the falsity of OPA's statement, and reassured Plaintiff.

(iv)    *Guilty Verdict and Aftermath*

77.     On August 23, 2023, the Honorable Dipti Pidikiti-Smith of the Fairfax County General District Court convicted Plaintiff's assailant of assault and battery on Plaintiff, substantially on the basis of Plaintiff's testimony (testimony that CIA sought to suppress or undermine) and Plaintiff's assailant's inculpatory statement.  Plaintiff's assailant received a sentence of three days in jail (suspended), probation for six months, and was forbidden to possess firearms for two years.

78.     On August 24, 2023, Van Zandt, then CIA's director of the Office of Security, stated to a large meeting at the National Reconnaissance Office's own Office of Security and

Counterintelligence—where many CIA officers are detailed for temporary duty—that recent reporting of sexual assault at the Agency is "blown out of proportion and exaggerated," and that he "know[s] first-hand that is not such a big issue."  Van Zandt further stated that the most important thing in the Agency's response to an allegation of sexual assault against one of its officers is to protect personally identifying information of alleged assailants and their victims, and national security.

79.     On August 24, 2023, Plaintiff sent a written inquiry to CIA to address her concerns that her assailant will remain a co-worker despite his criminal conviction and asked how CIA planned to ensure continued enforcement of her protective order against him; for example, although the protective order prohibits Plaintiff's assailant from possessing firearms, Agency officers sometimes possess firearms in training and in hostile environments overseas.  The Agency never responded in substance or detail to Plaintiff's written inquiries, or otherwise addressed her valid concerns.

80.     On information and belief, as of October 3, 2023, Plaintiff's assailant remains a security-cleared, serving CIA officer despite his sexual assault on Plaintiff and the Agency's stated guiding principle of integrity, which CIA defines as "uphold[ing] the highest standards of conduct" and "maintain[ing] the Nation's trust through accountability and oversight."[25]  Furthermore, the security clearance guidelines by which the Agency and its officers are bound include the following disqualifying behaviors:  (i) sexual behavior of a criminal nature, or of a public nature that reflects

---

25.     CENT. INTEL. AGENCY, *About CIA—Mission and Vision*, https://www.cia.gov/about/mission-vision/ (last visited Sept. 20, 2023).

a lack of judgment, (ii) sexual behavior which causes an individual to be vulnerable to coercion,[26] as well as (iii) any criminal conduct whatsoever.[27]

81.     Plaintiff's assailant may well be slated for further clandestine training.  This will expose to him the identities of undercover CIA officers and military Special Mission Unit operators, prepare and encourage his rise through the Agency's ranks, and provide him opportunities to take advantage of others, particularly other female colleagues, and female human intelligence sources in highly vulnerable positions.  His continued employment ensures Plaintiff's assailant remains a danger not only to Plaintiff, but to others in CIA.

82.     On September 11 and 15, 2023, Plaintiff also asked CIA to produce the name(s) of the Agency officer(s) who provided to her assailant and/or his defense counsel the manipulated workplace IMs and records of her statements to CIA officials about the attack, as well as any court order to third parties or any written request from law enforcement given to the Agency in connection with CIA's production of these records concerning her.  Plaintiff has not received that information, or a copy of a court order or law enforcement request.

(v)     *CIA Downgrading Plaintiff's Performance for her Congressional Testimony*

83.     Since joining CIA in 2022, Plaintiff received positive performance reviews during her time as a CIA trainee—until September 28, 2023.  On or about that date, Plaintiff's CIA training supervisor informed her that Plaintiff's latest performance review had been downgraded based on her "disclosure of personal information" when Plaintiff discussed with an instructor her September 19 appearance before HPSCI concerning her sexual assault.

---

26.     Off. of Dir. of Nat'l Intel., *supra* note 7, at 12.

27.     *Id*. at 20 (stating that "Criminal activity creates doubt about a person's judgment, reliability, and trustworthiness.  By its very nature, it calls into question a person's ability or willingness to comply with laws, rules, and regulations.").

84.     Shortly before CIA's downgrading of her performance, Plaintiff informed her training supervisor that she could not attend a meeting; when pressed for a justification for why she could not attend, Plaintiff disclosed that she was testifying to Congress.  When Plaintiff's training supervisor learned that Plaintiff discussed her appearance with that meeting's instructor, Plaintiff's training supervisor chastised Plaintiff verbally and in writing for allegedly interjecting her "personal information" into the Agency's training environment.  By downgrading Plaintiff's performance review, CIA retaliated against Plaintiff, a federal officer, because Plaintiff agreed to Congress's request for her testimony about a crime she suffered at the hands of a CIA colleague at the Agency's headquarters.

85.     Whenever Plaintiff competes for an assignment or promotion for the rest of her CIA career, some Agency official will likely say, *sotto voce*, at a panel meeting that is highly classified (necessarily so, because it will discuss Plaintiff's record recruiting human intelligence sources), that they have "heard"—without attribution—that Plaintiff once falsely complained of sexual assault, and ought to be denied a sought-after assignment or promotion on the basis that she apparently lacks integrity.  CIA's intent to retaliate against Plaintiff for complaining about her sexual assault is already demonstrated by Plaintiff's training supervisor downgrading her performance review because, in responding to a direct inquiry, Plaintiff discussed with an instructor her appearance before the Agency's Congressional oversight committee, despite Plaintiff's legal obligation as a federal officer to respond to requests for testimony from Congress.

86.     CIA and Agency officers conspired to interfere with Plaintiff's civil rights, and to obstruct justice, by attempting to intimidate her from testifying in the state court criminal trial of her assailant.  They sought to deny her the equal protection of the laws as she sought to enforce her legal right as a woman to be free from sexual assault.  CIA and its officers knew of and yet

failed to prevent their Agency colleagues from unlawfully disclosing Plaintiff's records to her assailant's defense team, a dereliction of duty for which they also bear responsibility for Plaintiff's emotional and professional injuries, under the Civil Rights Act of 1871.  CIA and its officers further retaliated against Plaintiff by downgrading her training performance evaluation because Plaintiff discussed her Congressional appearance with an instructor.

87.     In the lobby of CIA's old headquarters building, next to a memorial to fallen Agency officers, is inscribed a passage from the Gospel according to Saint John, "And ye shall know the truth and the truth shall make you free," which CIA Director Allen W. Dulles quoted in the presence of President John F. Kennedy at the dedication of that building on November 28, 1961.  Plaintiff bravely spoke the truth about the sexual assault she suffered at the hands of a colleague within that same building, and CIA punished her for it, thereby dishonoring a key principle on which the Agency's mission is based.

## CLAIMS FOR RELIEF

### Count One: Violations of the Privacy Act, 5 § U.S.C. 552a(b)

88.     Plaintiff incorporates the allegations in paragraphs 1-87 as if fully set forth herein.

89.     CIA is a federal agency.  Defendants Burns, Van Zandt, John Doe and Richard Roe are Agency officers.

90.     Plaintiff is a U.S. citizen and federal officer.

91.     Plaintiff's IMs and the tapes of her recorded statements to CIA concerning her assault are federal records related to her employment, containing her name and/or Agency pseudonym, as well as her voice, and were contained within a system of records.[28]

---

28.     *See id.* §§ 552a(a)(4)-552a(a)(5).

92.     Defendants improperly and willfully disclosed records about Plaintiff by name, concerning her employment with CIA, without her prior written consent.  CIA, and specifically John Doe and Richard Roe acting with the permission of Van Zandt, disclosed Plaintiff's records to her assailant and/or his counsel, and to the Fairfax County Commonwealth Attorney's Office. The Agency did so absent any written request from the prosecutor, Fairfax County Police Department, or order from the Fairfax County General District Court or any other court.[29]

93.     CIA's intentional, willful, and unauthorized disclosure of Plaintiff's records caused her substantial adverse effects involving professional harm, personal embarrassment and legal unfairness.  Plaintiff suffered actual damages as a result.

### Count Two: Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985(2)

94.     Plaintiff incorporates the allegations in paragraphs 1-87 as if fully set forth herein.

95.     In violation of Section 1985(2) of the Civil Rights Act of 1871, two or more CIA officers in Virginia, including John Doe and Richard Roe, conspired to interfere with Plaintiff's civil rights and to obstruct justice.  John Doe and Richard Roe did so by trying to intimidate Plaintiff in an attempt to deter her from testifying in a criminal matter in state court.  John Doe and Richard Roe did so with the intent to deny Plaintiff the equal protection of the laws and injure her for attempting to enforce her right as a woman to be free from sexual assault.  John Doe and Richard Roe thereby injured Plaintiff.

96.     Days before Plaintiff's scheduled testimony in the Fairfax County General District Court criminal trial of her assailant, CIA officers with the technical ability to do so conspired to access—without her knowledge or permission—Plaintiff's private records held on a classified Agency communications system.  No single CIA officer could access another Agency officer's

---

29.     *Id.* §§ 552a(b)(7); *see also id.* § 552a(b)(11).

workplace IMs on a classified system, and provide them to a third party for use in a state court proceeding.

97.     Procuring, selectively editing, and providing CIA records to Plaintiff's assailant's defense counsel, even if such production was authorized—and it was not in this case—would require the participation of individuals within the Agency's Offices of General Counsel and of Security, as well as CIA communications personnel with the technical ability to obtain a third party's IMs from an Agency computer system.  John Doe and Richard Roe conspired to commit the overt acts of accessing Plaintiff's IMs, editing her classified correspondence, printing her records from a top-secret computer system, and delivering copies of these communications to Plaintiff's assailant's defense team.  John Doe and his co-conspirator Richard Roe had a meeting of the minds and embarked on an unlawful attempt to intimidate Plaintiff from testifying at her assailant's criminal trial.

98.     John Doe and Richard Roe shared Plaintiff's IMs, without legal authorization, with her assailant and/or his defense counsel.  These communications were especially selected to present, in a false light, the appearance that Plaintiff had engaged in an extramarital relationship, and to suggest that her claim of assault sought dishonestly to deflect attention from her purported affair.  CIA further produced to the assailant's defense team, again without authorization or lawful request, Plaintiff's recorded statements to the Agency about her assault.

99.     John Doe and Richard Roe leaked Plaintiff's records in an unsuccessful attempt to intimidate her from testifying at her assailant's trial.  This trial, which resulted in Plaintiff's assailant's conviction, sought to vindicate her civil right as a woman to be free from sexual assault.

100.     John Doe and Richard Roe's misconduct caused emotional and psychological harm to Plaintiff, a married woman.  Furthermore, their unlawful acts defamed Plaintiff professionally

within CIA.   The deliberate suggestion of John Doe and Richard Roe, made through their unauthorized leak of Plaintiff's records, that she committed adultery and made a false claim of sexual assault to distract from her purported affair, sought to ruin her reputation for integrity within CIA.   In so doing, John Doe and Richard Roe permanently harmed Plaintiff's prospects for promotion and assignments within CIA's Directorate of Operations, ruining Plaintiff's promising career at its outset.

### Count Three: Further Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1986

101.   Plaintiff incorporates the allegations in paragraphs 1-87 as if fully set forth herein.

102.   In violation of Section 1986 of the Civil Rights Act of 1871, CIA officers knew that their colleagues conspired to interfere with Plaintiff's civil rights and obstruct justice by attempting to intimidate Plaintiff to deter her from testifying in a criminal matter in a United States court.   All of these CIA officers injured Plaintiff.   Knowing that these wrongs were about to be committed, and having power to aid in preventing their commission, these CIA officers with knowledge of the conspiracy neglected to do so.   They are therefore liable for all damages caused by their colleagues' wrongful acts, as these CIA officers could by reasonable diligence have prevented the harm Plaintiff suffered.

103.   John Doe and Richard Roe unlawfully leaked Plaintiff's communications and records to her assailant and/or his defense counsel in an attempt to intimidate her from testifying against him.   No single CIA officer could properly access another Agency officer's workplace IMs on a classified system, and provide them to a third party for use in an open state court proceeding. Procuring, selectively editing, and providing CIA records to Plaintiff's assailant's  counsel, even if such production was authorized—as it was not in this case—would require the participation of several of the Agency's legal, security, and communications personnel.

104.    CIA officers beyond just John Doe—including his co-conspirator Richard Roe—therefore had knowledge that Agency officers conspired to interfere with Plaintiff's civil rights and obstruct justice, by attempting to intimidate her from testifying at her assailant's trial. CIA officials are cognizant of the Agency's legal obligations, including those owed to Plaintiff under the Privacy Act, and to any citizen under the Civil Rights Acts. Any CIA officer with knowledge of their colleagues' conspiracy to make unlawful disclosures possessed the power to stop them, simply by alerting more senior Agency officials. Yet all CIA personnel with such knowledge neglected to exercise reasonable diligence and prevent these leaks.

105.    Defendant Burns is responsible as CIA's Director for the Agency's actions. Defendant Van Zandt bears the same responsibility for CIA's Office of Security. Defendants Burns, Van Zandt and CIA are liable for personal and professional injuries suffered by Plaintiff.

## JURY DEMAND

106.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial on all triable issues.

## PRAYER FOR RELIEF

107.    Wherefore, Plaintiff respectfully requests that the Court enter an award and judgment in her favor, against Defendants as follows:

(a)     Statutory damages;

(b)     Compensatory damages in an amount to be determined at trial;

(c)     Expenses and costs, including attorneys' fees, pursuant to 5 U.S.C. § 552a(g)(4)(b) and 42 U.S.C. § 1988; and

(d)     Such other relief as the Court deems appropriate.

Dated:  October 3, 2023

**HUGHES HUBBARD & REED LLP**
Kevin T. Carroll
DC Bar No. 1021479
1775 Eye Street, NW
Washington, DC 20006
kevin.carroll@hugheshubbard.com
Phone:  202-721-4603
Facsimile:  202-721-4646

Eda Stark*
MA Bar No. 703974
1775 Eye Street, NW
Washington, DC 20006
eda.stark@hugheshubbard.com
Phone:  202-721-4618
Facsimile:  202-721-4646
*Application for admission *pro hac vice*
forthcoming

**ATTORNEYS FOR PLAINTIFF**

28